### 3043.   PRUDENTIAL INSURANCE COMPANY
#### *v.* CHESTNUT.

Under the facts presented, the policy of insurance was in force at the date of the death of the insured, and the court did not err in directing the verdict in favor of the beneficiary.

DECIDED SEPTEMBER 30, 1911.

Action on insurance policy; from city court of Atlanta—Judge Reid. October 25, 1910.

*McDaniel, Alston & Black,* for plaintiff in error.

*Moore & Pomeroy,* contra.

RUSSELL, J. The case has been to the court previously; and, as many of the facts are stated in the opinion then delivered (8 *Ga. App.* 246), they will not be repeated here, but this opinion should be read in connection with the former opinion. On that hearing (which was upon demurrer) it appeared that the quarterly premium due December 21, 1908, had been paid. On the evidence coming in, it appeared that the last quarterly premium paid was the one due September 21, 1908. The further facts necessary to an understanding of the case here presented may be summarized as follows: The policy was dated June 21, 1906; the premiums were payable quarterly on the 21st of June, September, December, and March. They were paid up to and including September 21, 1908. The insured died July 8, 1909. The provisions as to extended insurance in the event of a lapse of the policy for non-payment of premiums are as follows: If the policy has been in force for one full year, an extension of sixty days from the lapse; if for two full years, 120 days from the lapse; if for three full years, one year

and 177 days from date of last payment of premium. It is also stated that if the premiums are paid in quarterly instalments, "due allowance" will be made for that portion of the year's premium which has been paid. The court directed a verdict in the plaintiff's favor.

The record contains the testimony of Mr. Samuel Barnett, an insurance actuary. His testimony so clearly shows that the policy was in force at the time of the death of the insured, and at the same time so lucidly explains the nature of such contracts as the one before us, that we deem it advantageous to the profession to set forth extracts from his testimony, in lieu of any extended discussion on our part. Among other things, Mr. Barnett testified as follows:

"I am an insurance actuary and an insurance lawyer. The duties of an actuary are to do the mathematical work of a life-insurance company, including the calculating of premiums and the reserves on policies, and everything in detail, the mathematical part and all about that part of it, and, to a large extent, the legal part of the work which bears on insurance. Practically, I have been all my life at this actuarial work. I have done this kind of work for eight or ten or more insurance companies. I have studied in Europe and made this work a life study. I am familiar with the methods of calculating reserve and expenses on insurance, and other provisions of life-insurance policies. I am familiar with the basis upon which all companies figure—not the Prudential Insurance Company specially, but all companies. There is only one way in which values under a policy can be calculated. The Prudential Insurance Company advertises itself as following the American Experience Tables of Mortality, at three per cent. interest. Now, if they do follow the American Experience Tables at three per cent., I know how they make their calculations. Three per cent. reserve means that the calculations are made upon the mortality table, and expected interest rate of three per cent.; it means a certain reserve laid aside each year at three per cent. would meet the policy when it matures.

"The component parts of a premium are, first, the mortality; second, the interest rate; and, third, the expense. The premiums accumulate the reserve: the reserve comes out of the premium. When the premium is first paid, it is made up of nothing except re-

serve and expense. Leave out the expense, then the uses to which a premium is put are simply to meet the mortality losses as they accrue. Now, when a premium is paid, all the net part of it is reserve at the time it is paid; you can call it reserve for mortality, for the company has got to pay the claim, and, therefore, you can say, in a certain sense, it is for mortality. The accumulated premium that the policy carries is all the company has to pay anything with, —extended insurance, or paid-up insurance, or mortality, or anything else. Premiums are paid from time to time, but it is utterly impossible, when you pay premiums, to say how much is for mortality, how much for surrender value, or how much for anything else. The object of all these premiums is to meet the conditions as they arise along in the future, whatever they may be, and the premiums should be sufficient for that purpose. The surrender values at the end of the third year do not represent the entire reserve on the policy; so far as that part of it is concerned, it is arbitrary. I am inclined to think that the 60 days extension at the end of the first year is an arbitrary value; I haven't figured it. I think the 120 days at the end of the second year is an arbitrary value.

"When the first premium was paid on this policy, that premium had to pay, first, an agent's commission; the company has to pay an agent's commission; if they don't get it from the first premium, they have got to get it somewhere else. I don't know as to the Prudential Insurance Company specially, but when the first premium on that policy was paid, this premium of thirty-three dollars, a certain part of that premium went first for agents' commissions. If you ask me the general custom, I can state it. All I know is the general custom. I don't know whether the Prudential paid commissions on the first year's premium; all I know is the general custom. I can only know from my general knowledge that a commission was paid on the first year's premium. If you ask me if I know a general practice, or if I know it in a general way, as a general custom, then I say I do know, I know it from general knowledge; I do not know it from any special knowledge concerning the Prudential Insurance Company.

"The doctor's medical examination fee was not taken out of the first year's premium as such; those things have to be paid, but I don't say they would take it out of the first year's premium. They paid the doctor something, but I don't say they took it out of the

first year's premium. A certain amount has to be paid for office expenses; if there isn't enough to cover those things, then they have got to go outside and get it. They have a certain amount to cover those things.

"There is no such thing as theoretical reserve distinct from legal. The reserve is a liability against the company, and the company has got to put it up; the company on full legal reserve basis on usual expenses has got to borrow from some other source to put up the reserve at the end of the first year. The same thing is true at the end of the second year; if the premiums are not sufficient to put up that reserve, they have to go somewhere and get it. No company on full legal reserve on ordinary expenses, after they pay the agents' commissions, and the medical examiners' fees, and the home-office expenses, has anything left at the end of the first year, out of the first premium. As a rule, there can not be much reserve saved out of first premium at the end of the first year; there can be reserve saved out of the premiums at the end of the second year. At the end of the second year there may be saved, as a rule, in the neighborhood of a quarter of the premium. I can tell what actual reserve saved there would have been on this policy at the end of the second year, if you will let me know what the expenses of the company were; otherwise I would have to go into an elaborate calculation of the expense. In order to tell, I would have to know what the commissions were, and what the medical examiner's fee was, and what the home-office expenses were, and what the renewal commission was, out of the second year's premium.

"In reference to what the first half of the third year's premium purchased, and the results arrived at by me, I will have to make a little explanation there. The premiums on life-insurance policies are all considered to be paid annually, in advance; all calculations are made by all companies on that basis, and there is strictly no such thing recognized as semi-annual payments of premium, or quarterly payments of premium, but the policy either goes into a new policy year, or it doesn't. The company, for the accommodation of the policy-holder, frequently allows quarterly payments or semi-annual payments, but technically the company is in that policy year when it accepts a quarter payment or half payment; and all settlements are made as of the end of the year, whenever the policy gets into that year at all. The surrender values are all based upon

the results at the. end of the year, provided the first quarter· is accepted by the company and it gets into that year at all.  Technically speaking, the whole premium is considered paid, and the company is considered to make an extension and a loan of the unpaid parts of the premium.  They have the technical name of "deferred premiums."  A deferred premium is simply a part of the year's pre-. mium—annual premium—which has not been paid; so that, strictly speaking, there is no such thing in insurance business at all as quarterly or semi-annual premiums,—nothing except annual premiums.

"If a man dies within the life of a policy, after the payment of two quarterly premiums, as to whether the company would deduct the balance of the year's premium, the company considers the unpaid quarters as debts due the company, and would deduct them. Whenever a policy goes into a year, the whole. of the premium has got to be paid by the policy-holder; if he lives, he pays it; if he dies, the company deducts it.  Whenever a company gets into the year, it carries the policy over to the end of the year; the payment of the first two quarters, therefore, carried this policy to the end of the third policy year, and entitled the policy-holder to the extended insurance allowed at that time; in the meantime the policy-holder being compelled to account to the company for those two unpaid quarters, that being the universal rule among life-insurance companies.  The two quarters paid on this third year entitled the policy-holder to an interpolation between the end of the second year and the end of the third year, and that interpolation will carry the policy 331 days from the middle of the third year; that is, from December 21, 1908, would carry the policy 331 additional days, clear over into the third year, to December of the third year.  I don't mean exactly over to the middle of the third year on that policy, from December 21, 1908; strictly speaking, it ought not to be interpolated exactly that way; it ought to be interpolated by making due allowance; by grading, instead of 331 days, it ought to be about 325 or 326 days. Still, it would carry it over the date of death, and it isn't necessary to go into that question more accurately.  It is not exactly proportionate—just like compound interest.  Compound interest is interest on interest, and it don't grow exactly in a straight line.  There is no use going into that; it don't make any difference, but amounts to a few days.

"I think the words 'due allowance,' under that policy, have a recognized meaning among insurance companies—recognized or special meaning; I don't mean the exact words 'due allowance' in themselves have, but the interpolation of those values between that time has a very distinct meaning among actuaries in insurance. The word 'interpolation' means this: Those benefits are not given except at the end of a distinct year; now, suppose something happens in between, interpolation is the method of arriving at what is the correct value to the assured upon this intermediate date. And that is a meaning thoroughly recognized in insurance, and it is in following that method of interpolation that I come to that conclusion. From the standpoint of the insurance company, the meaning of the clause in the policy: 'If the premiums on this policy are paid in quarterly or semi-annual installments, due allowance will be made in computing benefits, in proportion to the full year's premium,' is: Where benefits are allowed at the end of a certain year, and, for some reason, those benefits have to be paid at intermediate periods, then 'due allowance' means the assignment of the correct benefit, according to the same law, for those intermediate periods; that means that if the third year's premium as a whole purchased a year and 177 days of extended insurance, the first two quarters of that year's premium would purchase practically one half of that additional extended insurance; compared with the second year it would be a little less than one half, not much less than one half, a few days, no more probably than six. In determining what benefits, if any, the half of the third year's premium purchased, I would base my calculation on the interval between the second and third year; if the third year's premium purchased three years of extended insurance, and the second year's premium, as such, purchased two years of extended insurance, then the half of the third year's premium, in determining what extended insurance that half purchased, would be based upon what the whole of the third year's premium purchased. It is true that each year stands to itself in the calculation of this extended insurance and cash surrender values in the policy; each year is a separate calculation, in a certain sense.

"Now, of course, the policy year determines what the amount will be; the second year would be calculated independently of the third year, and the fourth year independently; these independent figures are not strictly added on to the separate purchases

for the preceding year in getting the total benefit beyond the year you are working on. The policy is not extended each year the same way exactly proportionately; the extended values for each year are figured by themselves; they don't run the same from year to year. If any allowance whatever is to be made for one half of one third of a year, it must be based on what the whole of that particular year's premium would purchase. The results of the end of the third year would not be based upon the results which may have been obtained on the first or second year's premiums; the results of the first or second year could not constitute the same basis of calculation; the additional value would be based upon the results at the end of the third year. One half of the third year's premium in this policy would purchase within five or six days of one half of the total extended insurance specified in the policy. Values are not based upon each separate year's premium; values are based upon a review of the whole situation, from beginning to end; values are based, at the end of each year, upon the accumulated reserve at the end of each year; that is, they ought to be; theoretically, they are. If there is any value at the end of the third year, it is based upon the reserves at the end of that year. If there is no reserve at the end of the first year, the policy has no value—it could not have. If there is no reserve at the end of the second year, the policy has no value at the end of the second year, technically. If there is no reserve at the end of two and a half years—the only way I can place a value on a policy, either cash surrender value, loan value, or extended insurance value, is knowing what the reserve was at a certain time, at which I undertake to figure their value. I would have to know what the value was at the end of the first year, to get the extended insurance at that time, provided the extended insurance was based upon the reserve; and it ought to be based upon the reserve; all surrender values are based upon reserve, or ought to be. True value is based upon the reserve at the end of the first year, but the surrender value, or extended value, or loan value, may be more or less than the true value of a policy. We have to know what the reserve is, before we can know what the reserve will buy. I can tell you what the reserve was on this policy, in dollars and cents. I have that at three per cent. I can tell you at three and a half per cent. in a few minutes; I can figure it. What the expenses are, the first year's commissions, the medical examiner's fee,

the expenses of the home-office, and the second year's renewal premium, wouldn't have anything to do with it. There is no actual reserve independent of the legal reserve; the law makes the reserve. The reserve of a policy is what is called the 'legal reserve,' and that is the legal reserve, and that is based on the American Experience Tables and the interest rate assumed by the company, and it is not a question of whether the company has actually that reserve on hand, or not.

"All insurance is written on the basis of annual premiums; quarterly premiums and semi-annual premiums are not recognized, as a matter of calculation; they don't calculate values on them; the company considers the full premium paid, if they run the policy on quarterly payments, and that they have loaned the policy-holder the rest of the money. No extension value is granted on premiums, but it is granted on reserve entirely; the premium has nothing to do with extended insurance; the extension is based upon the reserve as the basis of calculation; that is, it ought to be. The reason extended insurance at the end of each year varies is because the reserve varies at the end of each year. In dollars and cents, the reserve on this policy on December 21, 1908, was $23.50. That reserve would carry the policy beyond July, 1909; that is the reserve the company ought to have had. If you want me to go a little more accurately into that reserve, I may correct it this way, because there is what we call intermediate reserve: you should add to that figure which I have given one half of what is called pure premium. You had better put it that way, to get it accurately."

Objection was made to certain parts of Mr. Barnett's testimony, on the ground that he was dealing with unambiguous details of the contract, and was attempting to explain matters that stood in no need of expert interpretation. Even if this objection were abstractly valid, the error complained of is harmless, as, in our opinion, he interpreted the contract correctly, and no harm was done in merely taking his advice.        *Judgment affirmed.*